IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SOO LINE RAILROAD COMPANY, | ) | |
| | ) | |
| Plaintiff-Counterclaim Defendant, | ) | Case No. 14 C 4489 |
| | ) | |
| v. | ) | Judge Joan H. Lefkow |
| | ) | |
| BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND TRAINMEN and UNITED TRANSPORTATION UNION, | ) ) ) | |
| | ) | |
| Defendants-Counterclaim Plaintiffs. | ) | |

## OPINION AND ORDER

This case arises from a labor dispute between Soo Line Railroad Company ("Soo") and two unions, the Brotherhood of Locomotive Engineers and Trainmen ("BLET") and the United Transportation Union ("UTU"), about the creation of a cross-border freight pool between Thief River Falls, Minnesota and Winnipeg, Manitoba. Soo initiated this suit, requesting a declaratory judgment that the dispute is subject to mandatory arbitration under the Railway Labor Act, 45 U.S.C. §§ 151 *et seq.* ("RLA"). (Dkt. 1.) The unions counterclaimed and requested that the court declare that the dispute is subject to the mandatory bargaining provisions of the RLA. (Dkt. 9.) The unions also moved for a "status quo" injunction to prevent Soo from implementing the cross-border freight pool during the resolution of the dispute. (Dkt. 10.) On July 25, 2014, the court heard oral argument on the unions' request for a status quo injunction. For the reasons

discussed below, the court orders an evidentiary hearing on the unions' motion to be held on August 26, 2014.[1]

## FACTS

Soo, an indirect subsidiary of Canadian Pacific Railway Company ("Canadian Pacific"), operates a railroad system across a number of Midwestern states. Soo's trains are typically crewed by one engineer and one conductor. The engineers are represented by BLET and the conductors are represented by UTU. The rates of pay, rules, and working conditions that apply to Soo's engineers and conductors are governed by Soo's labor agreements with BLET and UTU.

Soo uses what is known as a "through freight pool" to staff its trains. Members of the pool are available on a "first in, first out" basis to fill assignments on runs supplied by the pool. On Mondays, Soo posts job bulletins that announce the freight pools for the following week and crew members are able to bid on their preferred pool. Positions within the pool generally are awarded in accordance with seniority. If a pool is not filled through the bidding process, Soo may force-assign the junior crew member who is not already assigned to a pool.

Soo's terminal in Thief River Falls, Minnesota serves as the designated home terminal for 22 engineers and 22 conductors. Prior to this dispute, Soo supplied crew members for trains operating on its track from Thief River Falls to Noyes, Minnesota (a distance of about 79 miles) from a through freight pool based out of Thief River Falls. Noyes is located on the Canadian border, adjacent to Canadian Pacific's terminal in Emerson, Manitoba. At Noyes, Soo's crew

---

[1] Although this opinion sets forth the court's understanding of the facts and law and engages in a limited application of the law to the facts, it does so only to guide the parties' presentations at the evidentiary hearing and to allow the parties the opportunity to correct any misapprehensions the court may have. The court will consider all evidence submitted at the evidentiary hearing and render its decision after the hearing.

would hand off trains to Canadian Pacific for destinations in Canada and would receive trains from Canadian Pacific for destinations in the United States.

Soo now would like to operate its trains from Thief River Falls to Winnipeg, Manitoba (a distance of about 143 miles) without switching crews at the Canadian border. To do this, Soo proposed a new cross-border freight pool based in Thief River Falls. Unlike the run between Thief River Falls and Noyes, the new run would require crew members in the pool to operate trains outside the United States and, because of the length of the journey, would require that they rest in Winnipeg before returning to Thief River Falls.

Soo first informed the unions that it intended to create the cross-border freight pool in June 2013. (*See* Dkt. 12-1 ("Semenek Decl."), ex. 1; dkt. 12-3 ("Babler Decl."), ex. 1.) In September 2013, Soo provided the unions with proposed agreements under the provisions of their labor agreements relating to "interdivisional service" between two divisions of the Soo rail system. (*See, e.g.,* Semenek Decl., ex. 3.) Both unions responded that the proposed change was not appropriately characterized as "interdivisional" service because the track in Canada was not Soo's property, but rather was the property of Canadian Pacific. (*See id.*, ex. 4; Babler Decl., ex. 4.) BLET further stated that the creation of a cross-border freight pool was a major dispute that required a section 6 notice under the RLA.[2] (Semenek Decl., ex. 4 at 2.) Soo then abandoned its attempt to create the cross-border freight pool through an interdivisional agreement.

On June 13, 2014, Soo informed the unions that it would post a job bulletin creating the cross-border freight pool for a run between Thief River Falls and Winnipeg. The unions objected. On June 16, 2014, Soo filed this action seeking a declaratory judgment that the dispute is subject exclusively to arbitration under the RLA and requesting an injunction to prevent BLET

---

[2] The process of resolving major disputes under the RLA is initiated by a "section 6 notice" named for section 6 of the RLA. *See* 45 U.S.C. § 156. Moratorium clauses in both the BLET and UTU labor agreements prohibit Soo from serving a section 6 notice before November 1, 2014.

and UTU from engaging in self-help for the duration of the arbitration. On June 21, 2014, Soo implemented the new freight pool from Thief River Falls to Winnipeg over the objection of BLET and UTU. Three days later the unions filed a motion for a preliminary injunction to prevent Soo from implementing the cross-border pool.

## LEGAL STANDARD

The RLA, which applies to railroads and airlines, is meant to provide for "the prompt and orderly settlement" of labor disputes. *Carlson* v. *CSX Transp., Inc.*, No. 13-1944 & 13-2054, --- F.3d ----, 2014 WL 3361072, at *10 (7th Cir. July 10, 2014) (quoting 45 U.S.C. § 151a). To that end, the RLA channels disputes into two categories and prescribes different resolution procedures for each. Courts have adopted the terms "major" and "minor" to distinguish between the types of disputes. *See Elgin, Joliet & E. Ry.* v. *Burley*, 325 U.S. 711, 722-27, 65 S. Ct. 1282, 89 L. Ed. 1886 (1945). Because a court may only issue a status quo injunction in the event of a major dispute between the carrier and unions, the distinction is critical to the disposition of the unions' motion.

A major dispute involves the "formation or modification of a collective bargaining agreement." *Carlson*, 2014 WL 3361072, at *10 (citing *Hawaiian Airlines, Inc.* v. *Norris*, 512 U.S. 246, 252, 114 S. Ct. 2239, 129 L. Ed. 2d 203 (1994); *Chicago & N.W. Transp. Co.* v. *Ry. Labor Execs. Ass'n*, 908 F.2d 144, 148 (7th Cir. 1990)). When a major dispute arises, the parties are required to participate in extensive negotiation and mediation. *See Bhd. of Maint. of Way Emps. Div./IBT* v. *Norfolk S. Ry. Co.*, 745 F.3d 808, 810 (7th Cir. 2014); *Nat'l Ry. Labor Conference* v. *Int'l Ass'n of Machinists & Aerospace Workers*, 830 F.2d 741, 745 (7th Cir. 1987) (citing 45 U.S.C. §§ 151-160). During this process, the status quo prevails and the railroad must "preserve and maintain unchanged those actual, objective working conditions and practices,

4

broadly conceived, which were in effect prior to the time the pending dispute arose and which are involved or related to that dispute." *Burlington N.R.R. Co.* v. *United Transp. Union*, 862 F.2d 1266, 1272 (7th Cir. 1988) (quoting *Detroit & Toledo Shore Line R.R.* v. *United Transp. Union*, 396 U.S. 142, 152-53, 90 S. Ct. 294, 24 L. Ed. 2d 325 (1969)) (citing 45 U.S.C. §§ 155, 156, 160). A court may enjoin a violation of the status quo during this time without a showing of irreparable injury. *See Consol. Rail Corp.* v. *Ry. Labor Execs. Ass'n*, 491 U.S. 299, 302, 109 S. Ct. 2477, 105 L. Ed. 2d 250 (1989). If no resolution is reached at the end of the RLA's prescribed resolution process, the parties may resort to self-help. *See Bhd. of Maint. of Way Emps.* v. *Atchison, Topeka & Santa Fe Ry.*, 138 F.3d 635, 638 (7th Cir. 1997); *Nat'l Ry. Labor Conference*, 830 F.2d at 745.

A minor dispute arises "out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions." 45 U.S.C. § 153 First (i). In the event of a minor dispute, the parties must "submit their differences to the binding authority of an adjustment board, which exercises exclusive jurisdiction over the dispute."[3] *Nat'l Ry. Labor Conference*, 830 F.2d at 745. During the resolution of a minor dispute, the railroad may apply its interpretation of the agreement and the union cannot strike. *See Burlington N.R.R.*, 862 F.2d at 1272; *Nat'l Ry. Labor Conference*, 830 F.2d at 749; *Burlington N. & Santa Fe Ry.* v. *Bhd. of Locomotive Eng'rs*, No. 01 C 7743, 2002 WL 47963, at *2 (N.D. Ill. Jan. 14, 2002).

When the parties disagree about whether the dispute is major or minor, it is left to the courts to decide, but "the party seeking to establish that a dispute is minor and under the exclusive arbitral jurisdiction of a RLA Adjustment Board faces a 'relatively light burden.'"

---

[3] The Seventh Circuit recently declined to address whether "a party's failure to comply with the RLA's arbitration provision deprives federal courts of subject matter jurisdiction rather than simply defeats the claim." *Carlson*, 2014 WL 3361072, at *10. As in *Carlson*, the distinction is immaterial to this case.

*Norfolk S.*, 745 F.3d at 813 (quoting *Consol. Rail*, 491 U.S. at 307). A dispute is classified as minor unless the carrier's claim that its interpretation is justified by the labor agreement is "frivolous or obviously insubstantial." *Nat'l Ry. Labor Conference*, 830 F.2d at 746 (internal quotation marks and citations omitted). A carrier's interpretation is "insubstantial" only if it would undermine the RLA's prohibitions against unilateral imposition of new contractual terms. *Consol. Rail*, 491 U.S. at 306. In making its determination, the court must be careful not to consider the merits of the underlying dispute; "its role is limited to determining whether the dispute can be characterized as involving the proper application or meaning of a contract provision." *Ry. Labor Execs. Ass'n* v. *Norfolk & W. Ry. Co.*, 833 F.2d 700, 704 (7th Cir. 1987).

In addition, the Norris-LaGuardia Act, 29 U.S.C. §§ 101 *et seq.*, which applies generally to injunctions in labor disputes, sets forth certain procedures for district courts to follow before issuing an injunction. Section 7 of the Act provides that a district court must "hear[ ] the testimony of witnesses in open court (with opportunity for cross-examination)" prior to issuing an injunction. 29 U.S.C. § 107. Thus, although the court could deny the unions' request for an injunction on the parties' written submissions, it cannot grant the injunction without holding an evidentiary hearing.

## ANALYSIS

Although the parties agree that the labor agreements covering the Soo workers based in Thief River Falls do not explicitly address the creation of cross-border freight pools, they disagree about the significance of the agreements' silence. Soo argues that it is allowed to implement the cross-border freight pool simply because it is not specifically forbidden by the labor agreements. The unions argue that it would be illogical to construe the agreements' silence to allow for the creation of the cross-border freight pool, citing extrinsic evidence of past practice

6

and industry standards. After reviewing the parties' submissions and holding oral argument, the court is unable to determine whether Soo's argument that it is allowed to extend a run into Canada under its labor agreements is frivolous and thus will order an evidentiary hearing on the issue. In anticipation of the hearing, the court will provide some guidance on its analysis to date and discuss certain evidence that may be relevant to the court's ultimate determination.

I. **Whether Soo Retains All Rights Not Explicitly Addressed In Labor Agreements**

Soo argues that it retains all management rights not relinquished by its labor agreements, including the rights at issue in this case.[4] Although Soo is correct in the broad brush, in order to determine those rights relinquished by management, courts have looked both to the language of the labor agreement and "working relationships, customs, and practices which are understood to be the norm, but which are nowhere reduced to a formal contract term." *Bhd. of R.R. Signalmen* v. *Burlington N.R.R. Co.*, 829 F.2d 617, 620 (7th Cir. 1987) (quoting *Bhd. of Maint. of Way Emps., Lodge 16* v. *Burlington N.R.R. Co.*, 802 F.2d 1016, 1022 (8th Cir. 1986)). If an agreement does not explicitly address the dispute in issue, a term may be implied through past practice. *Norfolk S.*, 745 F.3d at 813; *Burlington N.R.R.*, 862 F.2d at 1273; *see also Chicago & N.W.*, 908 F.2d at 153-55 (practices may show that carrier's action is implicitly forbidden); *Burlington N. & Santa Fe*, 2002 WL 47963, at *5 (if agreement is silent, court must consider whether there is implied working condition within parties' course of dealing that governs dispute) (quoting *Norfolk & W.*, 833 F.2d at 705). Thus the court cannot end its inquiry with the determination that the parties' labor agreements are silent on the issue. It must delve into industry standards and past practice to put the silence into context. If extrinsic evidence shows

---

[4] Soo concedes that it has not exercised these purported rights before now, but a carrier does not abandon rights reserved to it under its labor agreements by not exercising them. *See, e.g., Chicago & N.W. Transp. Co.* v. *Int'l Bhd. of Elec. Workers, Local Union 214,* 829 F.2d 1424, 1429-30 (7th Cir. 1987) (carrier retained right under labor agreement where "no affirmative indication that [carrier] ever abandoned its asserted right").

7

that Soo's interpretation of its labor agreements to allow for the cross-border freight pool is frivolous, the court must grant a status quo injunction.

## II. Industry Standards And Negotiation History

The unions argue that it is inconceivable that the silence of the labor agreements permits Soo to force its workers to crew trains across the Canadian border, but they have not submitted evidence showing that such a step would be unprecedented in the industry. For example, it is unclear to the court whether other U.S. carriers require their employees to perform cross-border work and whether in such instances the carriers have separately bargained for the right to send their employees across the border. Such information would aid the court in determining whether cross-border operations were contemplated at the time that Soo and the unions entered into their labor agreements. In addition, direct evidence of what was considered during negotiations would aid the court in interpreting the significance of the agreements' silence.

## III. Past Practice: Analogy to Trackage Rights Agreements

Both parties analogize to "trackage rights agreements," which are put in place when a U.S. carrier wants to run trains over another U.S. carrier's tracks. Such agreements must be approved by the Surface Transportation Board ("STB") and must be accompanied by employee protective conditions. *See, e.g., United Transp. Union—Gen. Comm. of Adjustment* v. *Surface Transp. Bd.*, 363 F.3d 465, 466-67 (D.C. Cir. 2004) (discussing trackage rights agreements and statutorily required employee protective conditions).

The unions argue that the labor agreements are silent on extending runs outside Soo's territory because the parties were aware during the labor agreement negotiations that such extensions within the U.S. would require the STB's approval and the accompanying labor protective conditions. They argue that the parties did not consider the possibility of a run into

8

Canada. Soo concedes that STB approval would be necessary if it extended a run over another carrier's tracks in the U.S., but argues that this is irrelevant to the case at hand because STB approval is not necessary for runs into Canada. Further, Soo suggested during oral argument that the labor-protective conditions imposed in the instance of a trackage rights agreement (and an interdivisional agreement[5]) are meant to protect those workers who are displaced by the encroaching run rather than those workers who are operating over the new track. In order to properly assess the validity of an analogy to trackage rights agreements, additional information about the type of protective conditions that are bargained for and the relevant parties to the bargaining would be helpful to the court.[6]

## IV. Past Practice: Analogy to Interchange Agreements

Both parties refer to two instances in which Soo workers are required to perform work in Canada. In each instance, the work occurs just within the Canadian border at an "interchange" point, and, in each instance, the parties have entered into separate agreements governing the work.

First, in 1978 the unions and Soo entered into agreements providing for the interchange of trains between Soo workers and Canadian Pacific workers at the linked yards in Noyes and Emerson just across the Canadian border. The agreements provide that "Soo Line crews may be required to pick up cars in the [Canadian Pacific] Yard at Emerson when the [Canadian Pacific]

---

[5] The parties seem to agree that trackage rights agreements are the closest analogy to the current situation, but they also refer to "interdivisional agreements" as an analogy. Such agreements are required by the labor agreements when Soo workers located in a certain division cross over to another division within Soo's territory.

[6] For example, the unions argue that Soo cannot extend a run into Canada without the approval of the local Canadian General Committees of Adjustment ("GCAs") for each union. It is unclear, however, whether the local GCAs must agree to the labor-protective conditions imposed in the event of a trackage rights agreement. Further development of facts relating to the unions' argument that local GCAs must approve all work being done within their territory would aid the court in determining industry practice.

crews are unable to deliver the interchange cars to Noyes, Minnesota." (Semenek Decl., ex. 7 at 2.) The 1978 agreements appear to cut both ways. On one hand, the agreements contain a specific provision outlining limited circumstances in which Soo workers may be required to enter Canada. This supports the unions' argument that cross-border work is not contemplated by the current agreements and must be specifically negotiated and bargained for. On the other hand, the agreements do not contain any special terms governing Soo employees' work in Canada (such as terms discussing the applicability of the Federal Employers Liability Act ("FELA") and compliance with Canadian regulations, etc.). This supports Soo's argument that it is not necessary for an agreement to contain specific provisions applicable to cross-border work in order for it to authorize cross-border work.

Second, the unions point to the separately bargained-for 2005 agreement between Soo and BLET that established a cross-border freight pool operating between Elkhart, Indiana and Windsor, Ontario. (Semenek Decl., ex. 8.) Soo claims that the agreement was put in place because Soo established a new home terminal in Elkhart, not because of the cross-border nature of the service to Windsor. Soo's argument is supported by the fact that the agreement does not contain any provisions specifically pertaining to the cross-border service and there is nothing that indicates that the service to Windsor was treated differently than service to other destinations that originated out of Elkhart.

In both cases, the cross-border activity provided for in the agreements appears to be a side issue rather than the central reason for the agreement, but the relevant cross-border work is much less extensive than in the case at hand. In performing its ultimate analysis, the court will have to determine whether this interchange work is properly distinguished from the extended run into Canada. To aid in this determination, it would be helpful to know whether there is any

official guidance on the length of a run that requires a trackage agreement versus an interchange agreement. Further, neither party addresses whether the 1978 or 2005 agreements were approved by the relevant GCAs in Canada. It would be helpful to know this fact, and more generally whether interchange agreements between carriers generally require the approval of both carriers' GCAs.

## V. History Of Dispute

In addition to past practice, a court may consider a carrier's past conduct with respect to the dispute in issue. *See Burlington N. R. R*, 862 F.2d at 1274. In *Burlington*, the carrier first attempted to negotiate with its unions to reduce the crew size on its trains. The negotiations failed, and the carrier tried a new tack: It sold the rights to operate trains over the relevant tracks to a wholly-owned subsidiary that was not party to the labor agreements that prevented the reduction in crew size. The subsidiary would use the carrier's trains over the carrier's tracks, but would hire employees and implement the smaller crews. The Seventh Circuit rejected the carrier's end run around its labor agreements, finding that its course of dealing with the unions "left little doubt that it was intentionally avoiding its obligations to [them]." *Id.*

Although Soo's motivation is less clear, and Soo points out that it is not violating any explicit provision of its labor agreements, the history of its conduct with respect to the cross-border pool indicates that it initially believed negotiation with the unions was necessary. Soo first proposed the cross-border freight pool under provisions of its existing labor agreements that allow for "interdivisional" service between two Soo divisions. (*See* Semenek Decl., ex. 1; Babler Decl., ex. 1.) And the new agreements that Soo proposed to accomplish this interdivisional service contained special terms relating to Soo employees' work in Canada. For example, the agreements required that crew members obtain passports and noted that they would

11

be subject to the regulations of the Railway Association of Canada. (*See* Semenek Dec., ex. 3 at 2; Babler Decl., ex. 3 at 2.) The proposed agreements also provided that Soo would not contest the jurisdiction of injury claims filed under FELA with respect to injuries sustained in Canada.[7] (*See id.*)

When the unions objected to Soo's use of the interdivisional provision, arguing that the service into Canada crossed into property owned by Canadian Pacific rather than Soo and thus was not "interdivisional," Soo dropped its request. A few months later, Soo unilaterally instituted the cross-border freight pool without any negotiation with the unions. The court is inclined to believe that Soo would not trigger an obligation to enter a new agreement with the unions unless it presumed that bargaining about the cross-border pool and entry into an agreement with specific cross-border terms would be necessary. The court welcomes any further information about the negotiation history that might shed light on the industry standards in analogous situations.

## VI.     Canadian Cross-Border Pool

In their motion for a preliminary injunction, the unions also requested that the court enjoin Soo from implementing or acquiescing in the implementation of a cross-border freight pool of Canadian Pacific workers that would originate from Winnipeg and operate over Soo's tracks to Thief River Falls. Soo responded that it "is not conducting any such operations, and would not permit anyone else to operate over its property except in compliance with the law, which would require that any such operations first be authorized by the Surface Transportation Board." (Dkt. 19 at 2.) The unions have withdrawn their request for injunction based on this representation, and the court agrees that the dispute is not ripe at this time.

---

[7] The court wonders whether Soo used a precedent in drafting the cross-border terms of the proposed interdivisional agreement. If these terms have been used in other instances it would be relevant to the court's analysis of past practice and industry standards.

12

**CONCLUSION AND ORDER**

For the reasons stated in the accompanying opinion, the court orders an evidentiary hearing on the unions' motion for a preliminary injunction (dkt. 10) to be held on August 26, 2014 at 9:00 a.m. If the parties are unable to conduct the hearing at this time, they are directed to contact the courtroom deputy to discuss alternate dates.


Date: July 30, 2014