IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SOO LINE RAILROAD COMPANY, | ) | |
| | ) | |
| Plaintiff-Counterclaim Defendant, | ) | Case No. 14 C 4489 |
| | ) | |
| v. | ) | Judge Joan H. Lefkow |
| | ) | |
| BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND TRAINMEN and UNITED TRANSPORTATION UNION, | ) ) ) | |
| | ) | |
| Defendants-Counterclaim Plaintiffs. | ) | |

## OPINION AND ORDER

This case arises from a labor dispute between Soo Line Railroad Company ("Soo") and two unions, the Brotherhood of Locomotive Engineers and Trainmen ("BLET") and the United Transportation Union ("UTU"), about the creation of a cross-border freight pool between Thief River Falls, Minnesota and Winnipeg, Manitoba.

Soo initiated the suit, seeking a declaratory judgment that the dispute is subject to mandatory arbitration under the Railway Labor Act, 45 U.S.C. §§ 151 *et seq.* ("RLA"). (Dkt. 1.) The unions counterclaimed and requested the court declare that the dispute is subject to the mandatory bargaining provisions of the RLA. (Dkt. 9.) The unions also moved for a "status quo" injunction to prevent Soo from implementing the cross-border freight pool during the resolution of the dispute. (Dkt. 10.) The court ordered an evidentiary hearing on the preliminary injunction motion (*see* dkt. 29), which was held on November 6, 2014. For the reasons discussed below, the unions' request for a preliminary injunction is denied. The parties are to report for a status hearing on December 18, 2014 at 11:00 a.m.

## FACTS

Soo, an indirect subsidiary of Canadian Pacific Railway Company ("Canadian Pacific"), operates a railroad system across a number of Midwestern states. Soo's trains are typically crewed by one engineer and one conductor. The engineers are represented by BLET and the conductors are represented by UTU. The rates of pay, rules, and working conditions that apply to Soo's engineers and conductors are governed by Soo's labor agreements with BLET and UTU. The agreements provide formulas for calculation of rates of pay and other benefits (such as stipends for meals and lodging) in the event Soo establishes a new route.

Soo uses what is known as a "through freight pool" to staff its trains. The pool supplies engineers and conductors for certain routes or "runs," and members of the pool are available on a "first in, first out" basis to fill assignments on those runs. On Mondays, Soo posts job bulletins that announce the freight pools for the following week and crew members are able to bid on their preferred pool. Positions within the pool generally are awarded in accordance with seniority. If a pool is not filled through the bidding process, Soo may force-assign the junior crew member not already assigned to a pool.

Soo's terminal in Thief River Falls, Minnesota serves as the designated home terminal for 22 engineers and 22 conductors. Prior to this dispute, these crew members supplied a through freight pool for a run from Thief River Falls to Noyes, Minnesota (a distance of about 79 miles) and back. Noyes is located on the Canadian border, adjacent to Canadian Pacific's terminal in Emerson, Manitoba. At Noyes, Soo's crew would hand off trains to Canadian Pacific for destinations in Canada and would receive trains from Canadian Pacific for destinations in the United States. Soo and the unions entered into "turnaround agreements" in 1978 that governed this interchange at the linked yards in Noyes and Emerson. The agreements contain a specific provision outlining limited circumstances in which Soo employees may be required to enter

Canada but do not contain any special terms governing their work in Canada. (*See* Dkt. 12-1 ("Semenek Decl."), ex. 7 at 2.)

Soo now would like to operate its trains from Thief River Falls to Winnipeg, Manitoba (a distance of about 143 miles) without switching crews at the Canadian border. To do this, Soo proposed a new cross-border freight pool based in Thief River Falls. (*See* Soo ex. 3.) Unlike the run between Thief River Falls and Noyes, the new run would require U.S. crew members in the pool to operate trains outside the United States and, because of the length of the journey, would require that they rest in Winnipeg before returning to Thief River Falls.

Soo first informed the unions that it intended to create the cross-border freight pool in June 2013. (*See* Semenek Decl., ex. 1; dkt. 12-3 ("Babler Decl."), ex. 1.) In September 2013, Soo provided the unions with proposed agreements pursuant to provisions of their labor agreements relating to "interdivisional service," which is service between two divisions of the Soo rail system. (*See, e.g.,* Semenek Decl., ex. 3.) Both unions responded that the proposed change was not appropriately characterized as "interdivisional" service because the track in Canada was not Soo's property, but rather Canadian Pacific's property. (*See id.*, ex. 4; Babler Decl., ex. 4.) BLET further stated that the creation of a cross-border freight pool was a major dispute that required a § 6 notice under the RLA.[1] (Semenek Decl., ex. 4 at 2.) Soo then abandoned its attempt to create the cross-border freight pool through an interdivisional agreement.

On June 13, 2014, Soo informed the unions that it would post a job bulletin creating the cross-border freight pool for a run between Thief River Falls and Winnipeg. The unions objected. On June 16, 2014, Soo filed this action seeking a declaratory judgment that the dispute

---

[1] The process of resolving major disputes under the RLA is initiated by a "section 6 notice" named for § 6 of the RLA. *See* 45 U.S.C. § 156. Moratorium clauses in both the BLET and UTU labor agreements prohibited Soo from serving a § 6 notice before November 1, 2014.

3

is subject exclusively to arbitration under the RLA and requesting an injunction to prevent BLET and UTU from engaging in self-help for the duration of the arbitration. On June 21, 2014, Soo implemented the new freight pool from Thief River Falls to Winnipeg over the objection of BLET and UTU. Three days later the unions filed a motion for a preliminary injunction to prevent Soo from operating the cross-border pool.

## LEGAL STANDARD

The RLA, which applies to railroads and airlines, is meant to provide for "the prompt and orderly settlement" of labor disputes. *Carlson* v. *CSX Transp., Inc.*, 758 F.3d 819, 831 (7th Cir. 2014) (quoting 45 U.S.C. § 151a). To that end, the RLA channels disputes into two categories and prescribes different resolution procedures for each. Courts have adopted the terms "major" and "minor" to distinguish between the two categories of disputes. *See Elgin, Joliet & E. Ry.* v. *Burley*, 325 U.S. 711, 722–27, 65 S. Ct. 1282, 89 L. Ed. 1886 (1945). Because a court may only issue a status quo injunction in the event of a major dispute between the carrier and unions, the distinction is critical to the disposition of the unions' motion.

A major dispute involves the "formation or modification of a collective bargaining agreement." *Carlson*, 758 F.3d at 832 (citing *Hawaiian Airlines, Inc.* v. *Norris*, 512 U.S. 246, 252, 114 S. Ct. 2239, 129 L. Ed. 2d 203 (1994); *Chicago & N.W. Transp. Co.* v. *Ry. Labor Execs. Ass'n*, 908 F.2d 144, 148 (7th Cir. 1990)). When a major dispute arises, the parties are required to participate in extensive negotiation and mediation. *See Bhd. of Maint. of Way Emps. Div./IBT* v. *Norfolk S. Ry. Co.*, 745 F.3d 808, 810 (7th Cir. 2014); *Nat'l Ry. Labor Conference* v. *Int'l Ass'n of Machinists & Aerospace Workers*, 830 F.2d 741, 745 (7th Cir. 1987) (citing 45 U.S.C. §§ 151–160). During this process, the status quo prevails and the railroad must "preserve and maintain unchanged those actual, objective working conditions and practices, broadly

4

conceived, which were in effect prior to the time the pending dispute arose and which are involved or related to that dispute." *Burlington N.R.R. Co.* v. *United Transp. Union*, 862 F.2d 1266, 1272 (7th Cir. 1988) (quoting *Detroit & Toledo Shore Line R.R.* v. *United Transp. Union*, 396 U.S. 142, 152–53, 90 S. Ct. 294, 24 L. Ed. 2d 325 (1969)) (citing 45 U.S.C. §§ 155, 156, 160). A court may enjoin a violation of the status quo during this time without a showing of irreparable injury. *See Consol. Rail Corp.* v. *Ry. Labor Execs. Ass'n*, 491 U.S. 299, 302, 109 S. Ct. 2477, 105 L. Ed. 2d 250 (1989). If no resolution is reached at the end of the RLA's prescribed resolution process, the parties may resort to self-help. *See Bhd. of Maint. of Way Emps.* v. *Atchison, Topeka & Santa Fe Ry.*, 138 F.3d 635, 638 (7th Cir. 1997); *Nat'l Ry. Labor Conference*, 830 F.2d at 745.

A minor dispute arises "out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions." 45 U.S.C. § 153 First (i). In the event of a minor dispute, the parties must "submit their differences to the binding authority of an adjustment board, which exercises exclusive jurisdiction over the dispute."[2] *Nat'l Ry. Labor Conference*, 830 F.2d at 745. During the resolution of a minor dispute, the railroad may apply its interpretation of the agreement and the union cannot strike. *See Burlington N.R.R.*, 862 F.2d at 1272; *Nat'l Ry. Labor Conference*, 830 F.2d at 749; *Burlington N. & Santa Fe Ry.* v. *Bhd. of Locomotive Eng'rs*, No. 01 C 7743, 2002 WL 47963, at *2 (N.D. Ill. Jan. 14, 2002).

When parties disagree about whether a dispute is major or minor, it is left to the courts to decide, but "the party seeking to establish that a dispute is minor and under the exclusive arbitral jurisdiction of a RLA Adjustment Board faces a 'relatively light burden.'" *Norfolk S.*, 745 F.3d at 813 (quoting *Consol. Rail*, 491 U.S. at 307). A dispute is classified as minor unless the

---

[2] The Seventh Circuit recently declined to address whether "a party's failure to comply with the RLA's arbitration provision deprives federal courts of subject matter jurisdiction rather than simply defeats the claim." *Carlson*, 758 F.3d at 831. As in *Carlson*, the distinction is immaterial to this case.

5

carrier's claim that its interpretation is justified by the labor agreement is "frivolous or obviously insubstantial." *Nat'l Ry. Labor Conference*, 830 F.2d at 746 (internal quotation marks and citations omitted). A carrier's interpretation is "insubstantial" only if it would undermine the RLA's prohibitions against unilateral imposition of new contractual terms. *Consol. Rail*, 491 U.S. at 306. In making its determination, the court must be careful not to consider the merits of the underlying dispute: "its role is limited to determining whether the dispute can be characterized as involving the proper application or meaning of a contract provision." *Ry. Labor Execs. Ass'n* v. *Norfolk & W. Ry. Co.*, 833 F.2d 700, 704 (7th Cir. 1987).

**ANALYSIS**

Although the parties agree that the labor agreements covering the Soo workers based in Thief River Falls do not explicitly address the creation of cross-border freight pools, they disagree about the significance of the agreements' silence. Soo argues that it is allowed to implement the cross-border freight pool simply because it is not specifically forbidden by the labor agreements. The unions argue that it would be illogical to construe the agreements' silence as tacit permission, citing extrinsic evidence of past practice and industry standards.

Although Soo is correct that management retains rights not relinquished by the labor agreements,[3] to determine whether a specific right has been relinquished courts look both to the language of the labor agreement and "working relationships, customs, and practices which are understood to be the norm, but which are nowhere reduced to a formal contract term." *Bhd. of R.R. Signalmen* v. *Burlington N.R.R. Co.*, 829 F.2d 617, 620 (7th Cir. 1987) (quoting *Bhd. of Maint. of Way Emps., Lodge 16* v. *Burlington N.R.R. Co.*, 802 F.2d 1016, 1022 (8th Cir. 1986)).

---

[3] Soo concedes it has not exercised these purported rights before now but that is not sufficient to show that Soo abandoned its rights. *See, e.g.*, *Chicago & N.W. Transp. Co.* v. *Int'l Bhd. of Elec. Workers, Local Union 214,* 829 F.2d 1424, 1429–30 (7th Cir. 1987) (carrier retained right under labor agreement where "no affirmative indication that [carrier] ever abandoned its asserted right").

6

If an agreement does not explicitly address the dispute in issue, a term may be implied through past practice. *Norfolk S.*, 745 F.3d at 813; *Burlington N.R.R.*, 862 F.2d at 1273; *see also Chicago & N.W.*, 908 F.2d at 153–55 (practices may show that carrier's action is implicitly forbidden); *Burlington N. & Santa Fe*, 2002 WL 47963, at *5 (if agreement is silent, court must consider whether there is implied working condition within parties' course of dealing that governs dispute) (quoting *Norfolk & W.*, 833 F.2d at 705). Thus the court cannot end its inquiry with the determination that the parties' labor agreements are silent on the issue; it must consider whether past practice and industry standards render Soo's interpretation frivolous or obviously insubstantial.

## I. Industry Practice

The unions' first argument is that the labor agreements do not specifically address cross-border operations because no one versed in the railroad industry would anticipate that a railroad would attempt a cross-border run with U.S. crew members manning trains a substantial distance into Canada.

Cross-border runs that start in the United States and venture a substantial distance into Canada are rare. When a northbound train crosses the border and continues into Canada, the general practice is for the U.S. crew to hand off the train to a Canadian crew. The U.S. crew, in turn, receives southbound trains from a Canadian crew. This interchange usually happens at a railroad yard within a few miles of the border and the U.S. crews do not venture north of the yard boundaries. There are two exceptions to this practice:[4] BNSF Railway has a run from Everett, Washington to Vancouver, British Columbia that is crewed from a pool of U.S. workers. The run is approximately 115 miles in total, with 30 miles in Canada. CSX Transportation has a

---

[4] Soo notes that the small number may be due to the fact that other railroads' labor agreements do, in fact, forbid extension of runs of runs into Canada.

shorter run from Massena, New York to Montreal, Quebec, also crewed by U.S. workers. Although there are labor agreements that specifically refer to these cross-border runs (among other runs) they do not discuss any issues specific to cross-border operation. (*See* Union exs. 2, 3.) There are no provisions requiring that crew members obtain passports or comply with the regulations of the Railway Association of Canada, and the agreements do not discuss what happens if a U.S. crew member is injured in Canada. In fact, it appears that the runs into Canada are not treated differently from the domestic runs.

Based on the facts presented on industry practice, the court cannot conclude that Soo's argument is frivolous. These two examples contradict the unions' argument that "[t]he existing Agreements manifestly do not apply to international service" and weakens the contention that "all the parties have long recognized that Soo cannot require either BLET-represented engineers or UTU-represented conductors to crew trains across the border into Canada without first entering into agreements with the Unions covering such operations." (Dkt. 12 at 10.) There is at least a colorable argument that the terms of Soo's existing labor agreements with the unions, which include mechanisms to establish rates of pay and other benefits for new runs, govern the creation of a cross-border freight pool for a run from Thief River Falls to Winnipeg.

## II.   The Domestic Analog:  Trackage Rights Agreements

The unions also argue that it was not necessary to explicitly include provisions in their labor agreements about run extensions onto other railroads' tracks because, in the United States, such extensions would require Soo to enter into a trackage rights agreement. Trackage rights agreements must be approved by the Surface Transportation Board ("STB"). The STB conditions its approval on an assurance by the railroad that it will bargain with the unions if the trackage rights agreement adversely affects their members. Thus, if Soo were extending a run

onto another railroad's track in the United States, the unions would have the opportunity to bargain for terms that compensate their members for any adverse impact.[5] Although it is possible that the parties simply did not consider that Soo would extend a run into Canada, the analogy to trackage rights agreements is not sufficient for the court to interpret the labor agreements' silence as a bar to extending runs into Canada on another railroad's tracks.

### III.  Union's Authority to Enter into Labor Agreements

Finally, the unions contend that "[m]ost significantly" the labor agreements could not have contemplated work in Canada because, at the time they were adopted, the unions' respective General Committees of Adjustment ("GCAs") did not have the authority to enter into a contract for work in Canada. (Dkt. 22 at 4.)

The argument for BLET proceeds as follows:  In 1892, BLET (or its predecessor) created GCAs, which cover specific geographical areas and lead bargaining with the railroad in that area. Soo has a single BLET GCA. (Some railroads have multiple GCAs.) Generally, when a GCA reaches a tentative agreement with a railroad, it sends the agreement to the BLET national division for review. If the agreement affects a BLET GCA other than the one that is party to the agreement, BLET national would object to the agreement. In 1978, when the BLET labor agreement at issue here was adopted, there was a BLET GCA that covered the tracks on the other side of the Canadian border. If BLET's 1978 labor agreement with Soo allowed Soo to create runs that encroached on territory belonging to another BLET GCA without further bargaining, it would have violated BLET's bylaws and Soo's BLET GCA would not have the authority to sign

---

[5] The unions did not exercise this right to bargain in the 35 examples of domestic trackage rights agreements presented by Soo, and thus the runs were governed by the terms and conditions of Soo's existing labor agreements. (*See* dkt. 25-2, ex. 2; dkt. 25-3, ¶¶ 3–4.)

it. The unions make this argument in broad brush; they do not provide any specific evidence about the negotiations of Soo's labor agreements.[6]

Although it may be true that the labor agreements at issue did not contemplate operation in Canada, the unions' argument that agreeing to operate there would have exceeded the authority of the GCAs does not convince the court that Soo's contentions are frivolous or obviously insubstantial. The unions have not pointed to any law that precluded them from entering into an agreement that allowed Soo to take the disputed action. The only barrier is internal union policy, which does not bind Soo. This is not enough to satisfy the unions' heavy burden to establish a major dispute.

The court cannot agree with Soo that this case presents a "garden-variety minor dispute." (Dkt. 19 at 6.) The labor agreements' silence might very well be due to the fact that the unions never expected their members to be forced to crew trains in Canada. Still, there is no explicit language barring Soo's actions and the union has not presented adequate evidence about industry practice or course of dealing to convince the court that Soo's interpretation of the labor agreements is frivolous or that Soo is unilaterally imposing new contractual terms on the unions. *See Consol. Rail*, 491 U.S. at 306; *Nat'l Ry. Labor Conference*, 830 F.2d at 746. Thus the court must deny the unions' request for a preliminary injunction.

---

[6] In support of this argument, the unions point to provisions of BLET's bylaws that require a GCA to send a tentative agreement to the BLET's national division and forbid agreements that conflict with BLET policy. (*See* Union ex. 1, § 42(b)-(c).)

**CONCLUSION AND ORDER**

For the reasons stated in the accompanying opinion, the unions' motion for a preliminary injunction (dkt. 10) is denied. The parties are directed to appear for a status hearing on December 18, 2014 at 11:00 a.m. to report on whether entry of final judgment is appropriate.


Date: November 21, 2014